## Gulf & Ship Island Railroad Company *v*. Mrs. Laura Cole.

### [58 South. 208.]

Carriers. *Breach of contract. Damages.*

> Where a passenger is negligently put off or allowed to get off at the wrong station, no case for punitive damages is made, unless there is some reckless, wanton, wilful, capricious or wrongful act done on the part of the agent or servant of the carrier.

Appeal from the circuit court of Simpson county. Hon. W. H. Hughes, Judge.

Suit by Mrs. Laura Cole against the Gulf & Ship Island Railroad Company. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*B. E. Eaton* and *May & Sanders,* for appellant.

We were appalled when the trial court declined to apply to this case the principle so aptly stated and thoroughly discussed by Chief Justice Mayes in the opinion of the court overruling the suggestion of error in the case of *Railroad Co.* v. *Hardie,* 100 Miss. 132, 55 So. 967. Unless this court can be persuaded to reverse the *Hardie case* the refusal of the trial court to grant appellant's instruction No. 3, denying recovery of punitive damages and the granting of plaintiff's instruction No. 1, allowing recovery of punitive damages was reversible error. See, also, *Railroad Co.* v. *Hughes,* 50 So. (Miss.) 627; *Railroad Co.* v. *Purnell,* 69 Miss. 652; *Railroad Co.* v. *Fite,* 67 Miss. 373; *Dorrah* v. *Railroad Co.,* 65 Miss. 14; *Railroad Co.* v. *Faust,* 32 So. (Miss.) 9; *Railroad Co.* v. *Pearson,* 80 Miss. 26, 31 So. 435.

We respectfully submit that the facts of this case tested by the well-settled rule in Mississippi, fall far

short of making a case for punitive damages. In the *Hardie case, supra,* 55 So. 974, our court said:

In the first place in the case of *Railroad Co.* v. *Marlett,* 78 Miss. 872, 29 So. 862, this court held that, "A willful wrong that gives a cause of action for the imposition of exemplary damages, must be denoted by a wrongful act done with a knowledge of its wrongfulness." When under the facts of this case the conductor refused to back he was guilty of no wrongful act and no punitive damages should have been allowed. In the case of *Railroad Co.* v. *Scurr,* 59 Miss. 456, 42 Am. Rep. 373, a passenger was carried by his proper station by reason of the negligence of the conductor, it does not appear that a demand was made by the passenger for the backing of the train, but punitive damages was sued for and the court held that for a mere breach of duty no punitive damages could be assessed." See, also, *Railroad* v. *Dodds,* 53 So. (Miss.) 409.

It was negligence if the conductor erroneously advised plaintiff her station had been reached but such conduct did not amount to a "willful wrong . . . denoted by a wrongful act done with a knowledge of its wrongfulness." The truth is the plaintiff admits that every courtesy was extended to her by the train employees, that they were careful and polite in assisting her off, and all that is contended is that by mistake she was directed to get off at the wrong place. If she had known what the conductor under the facts in this record had a right to assume she did know, that is, that she would recognize her proper destination and would not get off until it was reached, there would have been no occasion for plaintiff to get off at the wrong place. In other words, she would have said to the conductor, "This does not look like Low, my destination," and the conductor, having his attention directed particularly to her position, would have discovered and avoided his mistake. Ap-

pellant owed plaintiff the duty to transport her to her destination, Lcw, and it breached its duty; but for a mere breach of duty no punitive damages can lawfully be assessed.   Indeed, under the facts of this case, we think nominal damages is all that can properly be allowed.   *Railroad Co.* v. *Lambert*, 54 So. (Miss.) 836; *Railroad Co.* v. *Drummond*, 73 Miss. 813; *Thompson* v. *Railroad Co.*, 50 Miss. 315.

*Willing & Davis,* for appellee.

The court very properly submitted the question of punitive damages to the jury.   This is a typical case for the imposition of punitive damages.

As was said in the case of *Davis* v. *Railroad Co.*, 95 Mo. 542: "This was manifestly a case in which the jury should have been allowed to say whether, under all the circumstances there was such gross negligence on the part of the railroad company, such conscious indifference to the rights of the plaintiff and the public, as warranted the imposition of punitive damages, and, of course, as a consequence, if punitive damages were allowed, such a case as warranted damages for mental suffering."

In order to justify the imposition of punitive damages against common carriers it is not necessary to prove intentional wrong or insult.   It is sufficient if negligence is shown so gross as to evince a reckless disregard of plaintiff's rights or conscious indifference to the rights of the plaintiff.

The rule as to punitive damages is stated in the case of *Manufacturing Co.* v. *Marlett*, 78 Miss. 872, as follows:

"It has been held in this case that punitive damages may be recovered only in case where the acts complained of are characterized by malice, fraud or willful wrong, evincing a disregard of the rights of others."   The

courts have uniformly held that gross negligence is tantamount to willful wrong and justifies the imposition of punitive damages.

On the subject of punitive damages we call the court's attention to the following authorities: *Hurst's case,* 36 Miss. 660; *Kendrick's case,* 40 Miss. 374; *Railroad Co.* v. *Whitfield,* 44 Miss. 466; *Wilson* v. *Railroad Co.,* 63 Miss. 352; *Higgins' case,* 64 Miss. 80; *Dorrah* v. *Railroad Co.,* 65 Miss. 14; *Railroad Co.* v. *Fite,* 67 Miss. 373; *Railroad Co.* v. *Lowry,* 79 Miss. 431; *Telephone Co.* v. *Watson,* 82 Miss. 101; *Railroad Co.* v. *White,* 82 Miss. 120; *Railroad Co.* v. *Lanning,* 83 Miss. 161; *Railroad Co.* v. *Mitchell,* 83 Miss. 179; *Railroad Co.* v. *Harper,* 83 Miss. 561; *Telephone Co.* v. *Hiller,* 93 Miss. 658; *Burns* v. *Railroad Co.,* 93 Miss. 816; *Davis* v. *Railroad Co.,* 95 Miss. 540.

Argued orally by *Geo. W. May,* for appellant.

Argued orally by *C. H. Alexander,* for appellee.

Mayes, C. J., delivered the opinion of the court.

Mrs. Cole brought suit against the Gulf & Ship Island Railroad Company for damages, alleged to have been occasioned her by reason of the fact that she was allowed to get off of the train, or was negligently put off, by the servants of the company at the wrong station. In the declaration filed both actual and punitive damages are claimed, and on the trial an instruction was given for the appellee, authorizing the jury to award punitive damages. The jury returned a verdict for three thousand dollars, from which judgment the railroad company prosecutes an appeal.

The chief contention in this court for appellant is that the facts did not warrant the court in authorizing the jury to assess punitive damages. The facts are substantially as follows: Mrs. Cole lived about six miles

north of Magee, in Simpson county, and about twenty
miles from a little station on the Gulf & Ship Island
Railroad, called Low, and about the same distance from
another little station on this same road, called Milltown.
Milltown and Low are some two or three miles apart;
Milltown being east of Low and nearer Soso, the point
where Mrs. Cole boarded the train. It appears that
Mrs. Cole was not familiar with the surroundings at
Low or Milltown; while she had passed through twice,
she had never been there. It is shown that on the 29th
day of January, 1911, Mrs. Cole bought a ticket from
Soso to Low, Milltown being the station nearest her
starting point, and about three miles from Low; the
train, of course, reaching Milltown first. Mrs. Cole had
been on a visit to a sick sister at Soso, and on the above
date was returning home, and was expecting to be met
at Low by a son and nephew, with a team to take her
home that evening. Mrs. Cole had with her a baby about
seven months old, a basket, a cloak, and a small grip.
When the train reached Milltown, she says "the train
stopped, and the conductor came through and hollowed
'Low,' and when he got where I was, he picked up my
baggage, and I followed him, and he set my baggage
down on the ground and got back on the train and it
pulled out." She then says she stood a while, think-
ing she was at Low, as she had never been there before.
Gathered at the stopping point of the train were some
boys, and Mrs. Cole asked them if there was any team
there to meet a lady. There were no houses at Mill-
town; nobody living there, and no depot and no shelter.
The day was fair, but cool. She arrived at Milltown
late in the evening, about 4:30 or 5 p. m. She asked
the boys if they would go with her to where she could
get shelter; and one of them said he would go with her
to Mr. Charley Butler's house, as it was right on his
way home. She states that she had known Mr. Butler,

and after going to his home she got him to telephone to her home folks that she was there. In going to Mr. Butler's house, she had to go through the millhouse and a little swamp; that there was just a muddy pathway up a plank to the millhouse and on out through the gate into the big road. In going to Butler's which was about a mile, or a little over, she carried the baby and part of her baggage, and the boy carried a part of it. The son received the telephone message and came on over where she was for her, reaching there about 10 or 11 o'clock that night. Mrs. Cole did not stay with Charley Butler, but stayed at Mr. Alvy Butler's, and was well taken care of, and reached her home about 1 o'clock the next day. Mrs. Cole states that on account of the walk, etc., she was made sick, had cold, tonsilitis, and fever, and aching bones, and remained in this condition about a week. After Mrs. Cole reached Charley Butler's, she went to Mr. Alvy Butler and his wife, on the invitation of the latter, because she had formerly lived by them, and they wanted her, and because they said they had more conveniences to take care of herself, son, and team than at Charley's. Mrs. Cole states that she lived twenty miles from Low, and if she had gone to Low and gone out in the buggy to her home she would not have reached home as early as she reached the home of Mr. Butler. This is substantially the testimony of Mrs. Cole.

The testimony of the boys who were at the Milltown station is of little importance in the consideration of this case. They merely verify the fact that Mrs. Cole got off at Milltown, and that the conductor helped her off, and that one of them went to Mr. Butler's with her and helped her carry some of the baggage. None of the witnesses claim that there was any impoliteness, rudeness, or misconduct on the part of the servants of the railroad company; the cause of complaint being that

Mrs. Cole was put off at the wrong station, as she says, by the conductor.

While it is not important, in the consideration of this case, to consider the testimony of appellant on the question involved, since if appellee's testimony warranted the submission of the question of the allowance of punitive damages to the jury, this case must be affirmed, still, in order to more completely state the case, it is not amiss to say that the conductor was put upon the stand, and by him it was shown that the train was due at Low at 4:38 p. m., and was about on time. This would place it at Milltown ten or fifteen minutes earlier. The conductor states that the train stopped at Milltown, and two other passengers got off, a Mr. Beavers and wife. The conductor states that after reaching Low, as he had a lady and child to put off there, he spoke to the flagman, and that employee told him the lady got off at Milltown; and the conductor states that this was the first he knew of it. The conductor denies that he assisted Mrs. Cole off at Milltown, and denies that he called any stations, but stated that it was the flagman's duty, and when the flagman reached Milltown he called "Milltown," not "Low." The testimony of the flagman is about the same as that of the conductor. The flagman states that when he reached Milltown he called that station by its proper name, and several passengers got off; that he helped Mrs. Cole off.

Mr. Beavers testified that he was on the train and got off at Milltown with his wife; that Milltown is a regular flag station; and that he remembers seeing a lady get off there. Beavers also states that there is quite a difference between the appearance of the stations of Low and Milltown; that at Low there is a depot, sawmill, and several buildings; at Milltown there is nothing but a store and an old sawmill. The testimony of Mrs. Beavers is about the same as that of her husband, except

101 Miss.—27

that she had a conversation with Mrs. Cole and Mrs. Beavers says that Mrs. Cole looked a little lost. Mrs. Beavers testified that she asked her, "Are you looking for some one to meet you here?" and Mrs. Cole replied, "I am looking for my husband."

The facts of this case, when considered only on the testimony of Mrs. Cole, make no case for the infliction of punitive damages. The very most that can be said is that the servants of the railroad were only negligent. If it be true that Milltown was called Low by the flagman, or by the conductor, not a fact surrounding the case warrants the inference that, in miscalling the station, the servant of the company acted with recklessness, or in willful or capricious disregard of the rights of appellee. In the case of *Y. & M. V. R. R. Co.* v. *Hardie,* 55 South. 967, 34 L. R. A. (N. S.) 742, we had occasion to review all the cases on the subject of punitive damages, and to restate the rule on this subject in this state. We shall not go over that ground again.

The case of *Y. & M. V. R. R. Co.* v. *Hughes,* 50 South. 627, is a similar case to this, except that its facts make the case a stronger one for the allowance of punitive damages than the case now before the court; but this court held, in the Hughes case, that no punitive damages could be recovered. An examination of the original record in the Hughes case shows this. It appears that Mrs. Hughes sued the Yazoo & Mississippi Valley Railroad Company for ten thousand dollars actual and punitive damages, and recovered a judgment for two thousand five hundred dollars. The facts show that about 4:30 o'clock on Sunday afternoon Mrs. Hughes boarded the Yazoo & Mississippi Valley train at Vicksburg, bound for Natchez, and that she had never been on the line before, except once, and was thoroughly unfamiliar with the stops and stations on the line. The ticket carried her from Vicksburg, via Harriston, to Natchez; and

at Harriston she was to make a change. She had with her a suit case, a little girl five years old, and a baby nine months old. Further stating the case in the language of Mrs. Hughes, she was asked on the trial: "What happened after you left here [Vicksburg]? State whether or not the conductor took up your ticket, or punched it. Yes, sir; took my ticket and gave it back to me. What did you do, and what happened? Well, I sat there and taken care of my babies and myself until the flagman, I judge from his looks, came in and called out the station, and I didn't understand what he said, and I said, 'Is this Harriston?' I said, 'Is this Harriston?' And he said, 'Yes, ma'am,' and he pushed the door and came up to me, and I said, 'Is this Harriston?' And he said, 'Yes, ma'am,' and he picked the suit case and the little girl and hustled to the door with them, and I came behind them. What did you have? The baby; and when I got down off of there the train had pulled out, and I saw a bunch of negroes around, and I said, 'Is this Harriston?' to one of them, and he said: 'No, ma'am; you are a long ways from Harriston.' And I said: 'What shall I do, and where shall I go?' And I said, 'Is there any white people around here?' And he said: 'No, ma'am; there is one white man at the store, and he will soon be gone.' And I got the little girl and hustled over to the store, and told him what had happened, and he said, 'Go in the office and sit down,' and said, 'When I get through, I will see what I can do for you.' And when he got through his wife suggested the only thing to be done for me was to drive me back home, as there was no one to stay with; and he said, 'You better drive back home and get a start in the morning again.' Were you driven back? Yes, sir. What time did you get to your home? About 8 o'clock, I think. About that time, as near as you remember? Yes. Just tell the jury what

your feeling was; what you experienced when you saw the train had gone, and you were put off at Glass Station, instead of Harriston? I became so nervous and excited and shocked almost to death to think I had been put off that hour in the evening with two little children, almost helpless and at night, with nothing but negroes around, and I said: 'What in the world will I do? Will I have to stay here all night with these negroes?' And when I got home I couldn't eat or sleep, and the next day, even although I left next day on my journey, but I really was not able to, but because I was compelled to go. You say that night— How did you suffer? I had a severe headache and nervous. I couldn't sleep, and I had to get up and light the lamp; and every time I closed my eyes I was being put off the train, and I had to get up. And I didn't sleep any for two or three nights, because the idea of being there with the two babies made me feel terrible; a baby nine months old having to be out at night and among strangers, and no place to go, was nearly more than I could stand.''

It is needless to further quote from the testimony in the Hughes case. The court, in the Hughes case, speaking through Judge Whitfield, said: "Manifestly this is no case for the imposition of punitive damages. It was therefore fatal error to refuse the defendant the sixth instruction, charging the jury not to award punitive damages.'' The case now on trial cannot be affirmed without overruling the Hughes case, and we feel no inclination to do that. When a passenger is negligently carried by his proper station, or put off or allowed to get off at the wrong station, no case for punitive damages is made, unless there is some reckless, wanton, willful, capricious, or wrongful act done on the part of the agent or servant of the road.

But appellee relies on the case of *Davis* v. *Y. & M. V. R. R. Co.*, in 95 Miss. 540, 49 South. 179. In the argu-

ment of the Hughes case, counsel in the case relied on the Davis case, and cited it in his brief.   The same judge delivered the opinion in both cases, and, although the Davis case was decided long prior to the Hughes case, this court took the view that the two cases were entirely distinct.   The Davis case carried the doctrine of the right to recover punitive damages as far as it should be carried in this character of case.   In the Davis case, the facts show that Davis was a  passenger, and re- quested to be put off at a flag station called Etta.   The conductor had never been over the particular line be- fore, because it was new, and yet, assuming to know all about it, told Davis that the train was going over a new route a short distance from the old, but the flag sta- tions on the new route had corresponding names, and that he would put him off at the new station of Etta, only a short distance from the old.   Davis explained to the conductor that a buggy would meet him at Etta, and the conductor told him that the distance was short, and he could walk to the old station and intercept the buggy. It was after dark, and the station, Etta, was called, and the conductor told Davis they had reached Etta.   Before getting off, however, Davis told the conductor that he was not familiar with the ground, and wanted to be certain that this was his station.   Although the facts show that the conductor knew nothing about it himself, yet he assured Davis he was there, and allowed and thus induced Davis to leave the train.   Davis attempted to exercise every precaution to be put off at his proper station, and emphasized this to the conductor, and yet, despite all this, the conductor put Davis off at the wrong station; and the court held, under these circumstances, that the facts showed such utter disregard of the duty of the conductor that the question should have been submitted to the jury as to whether or not punitive dam- ages should have been allowed.   In this case, there is

nothing of this in the record. Mrs. Cole was simply put off, or was allowed to get off, at the wrong station by the mere neglect of the servants in charge of the train.

The case of *Southern Ry. Co.* v. *Phillips*, 136 Ga. 282, 71 S. E. 414, is very similar to this. The facts show that Mrs. Phillips sued the Southern Railway Company for damages for being put off at the wrong station. It appears that she bought a ticket and boarded the passenger train at Brunswick for Empire. In making this journey, it was necessary for her to change cars at Jesup. She was accompanied by a small child, and carried a valise. After she had been traveling for some time, and as the train was slowing up for a station, the conductor announced that it was the place for Mrs. Phillips to leave the train, at the same time taking up the baggage and directing her, with the child to follow him. Acting upon the direction of the conductor, she left the train, which, as soon as she disembarked, rapidly moved away, leaving her in darkness. The place where she was put off was Odessa, a place five miles south of Jesup, without depot accommodations or other accommodations for her safety. It was ten or eleven o'clock at night when she left the train, and for some time the only persons she saw were some negroes. She was very much frightened, and after some time had elapsed a white boy was called to her by the negroes, whom she asked if there were any white people in the community; and he finally secured a place with his mother for her to spend the remainder of the night. Mrs. Phillips contended that the conductor, in causing her to leave the train at a point other than the right place, in the nighttime, was guilty of gross negligence and wanton and willful misconduct. When the conductor took up her ticket, she asked him if she did not have to change at some place between Brunswick and Empire, and he said, "Yes; you change at Jesup"—and told her the train was due to arrive at

Jesup about ten o'clock.  Near that time, the conductor came through the train and called out the station, and she understood him to say Jesup.  She was intending to ask some one before the train stopped if that was Jesup, when the conductor took up her valise and hatbox, and said, "Here is where you get off;" and when the train stopped *the conductor* assisted her to alight. She thought she was at Jesup until the train had left.  She saw some negroes around the station, and also a white lady, who got off of the same train she did.  When she got off of the train, she saw a switch light, and started in that direction, thinking it was the depot.  She asked the lady who got off of the same train with her where she was going, and she replied she was going home; and she asked her where to go to take the next train, and she said, "Go down there and ask them," waiving to the place where some negroes were.  She asked them, where to go to take the next train, and they replied there would be no train until the next morning, and said: "You think you are at Jesup, but this is Odessa."  She inquired where she could spend the night and they directed her to the captain's house.  She was invited to spend the night with a lady, and did not go to sleep until about four o'clock in the morning on account of the fright brought about by being put off of the train under the circumstances she narrated; and the next morning she boarded the train, and was carried to her destination on the same ticket.  The servants in charge of both trains treated her civilly and politely, and the question in the case was whether or not she was entitled to punitive damages.

The trial court instructed the jury that they might assess punitive damages, and the court in reviewing the case and reversing it, said: "We are at a loss to see, from the facts as narrated by the plaintiff, any circumstances of aggravation authorizing the recovery of pun-

itive damages. According to her own testimony, the agents of the railway company were civil and courteous in their treatment of her, and her being put off at the wrong station was the result of a mistake. It is her contention that the conductor told her that she had arrived at the place where she was to change cars, and invited her to get off, and that she got off at the wrong station on his invitation. If the conductor's version of the incident be accepted as true, the plaintiff misunderstood the station, announced 'Odessa,' to be 'Jesup,' and voluntarily left the train. Be that as it may, it is clear from both viewpoints that the plaintiff's leaving the train at Odessa was the result of a clear mistake. There is not a line in the evidence which indicates that any servant of the defendant company was influenced by any improper motive, or impelled by any desire to injure or to willfully discommode the plaintiff. The charge on the subject of punitive damages should not have been given."

The case of *Moss* v. *Mo. Pac. R. R. Co.,* 128 Mo. App. 385, 107 S. W. 422, from the Missouri Court of Appeals, is directly in point. The evidence in the Moss case showed that the plaintiff was a stranger on the line of railway, and that, while entitled to passage to a station called Mora, he was told by defendant's servants to get off at a place called Dumpville, five miles distant. It was night and raining, and plaintiff, being a stranger, accepted the statement of the servant in charge of the train as to Dumpville being Mora and got off, and did not discover the mistake until the train had left. The court held that this was no case for exemplary damages. To the same effect is the case of *C. C. C. & St. L. Ry. Co.* v. *Quillen,* 22 Ind. App. 496, 53 N. E. 1024, and the case of *Tennessee Central R. R. Co.* v. *Brashears, Guardian,* Kentucky Court of Appeals, 97 S. W. 349.

After a most thorough search of the authorities, we have not found one case that authorizes the recovery of

punitive damages under the facts of this case.  The *Davis case,* in 95 Miss. 540, 49 South. 179, is nearer so holding than any case we have been able to find, or that counsel for appellee cite.

The instruction authorizing the jury to assess punitive damages in this case was erroneous, and the case must be reversed and remanded.

*Reversed and remanded.*

McLean, J. (dissenting).

The record presents a case where the question of punitive damages was properly left for the consideration of the jury.  The record shows that the conductor was familiar with the stations on the railroad; that the train arrived at Milltown before dark, and the conductor testified that Milltown and Low were very dissimilar in appearance; that there was a mill at Low, and that there was nothing at Milltown; that there was also a depot at Low and a sawmill and some residences on the hill, close by and in plain view, but there was nothing in sight at all at Milltown.  In other words, it is apparent from the record in this case that there was no possible chance for the conductor to be mistaken; that the place at which the plaintiff was put off was not her point of destination.    The conductor was bound to have known that the train had not reached Low.   Even a casual glance by the conductor at his surroundings, when the plaintiff was assisted off of the train, would have disclosed that the station was not Low, but some other station. This was the first time the plaintiff ever was at either Milltown or Low; she did not know one station from the other.  She was dependent entirely upon the trainmen for information.  If the appellant can escape punishment for its conduct in this case, it is difficult to conceive of a case where punitive damages could be allowed, except where the evidence is clear, positive, and distinct

of the *purpose* and *intent* to inflict a wrong. Such is not
the law, as declared by all of the authorities. Whenever
the evidence is such as to evince a reckless disregard of
consequences, or when there is a conscious disregard of
the rights of others, it is universally held that such con-
duct is gross, and authorizes the imposition of puni-
tive damages.

The leading case in this state upon the subject of
exemplary damages, and one which has been followed
without one discordant note, and where the distinction
is clearly drawn between acts which do and which do
not justify the imposition of exemplary damages, is
*Chicago Railroad Company* v. *Scurr,* 59 Miss. 456, 42
Am. Rep. 373. In that case, the plaintiff took passage
at night on defendant's train from Grenada to Torrence,
holding a ticket to the latter place. Shortly before the
train arrived at Torrence, the conductor became involved
in an altercation with some immigrants who, by mistake,
had gotten upon the wrong train, and also with a pas-
senger who, without authority, had pulled the bell cord.
Thrown off of his balance by these occurrences, the con-
ductor carelessly and negligently permitted the train
to run by Torrence without stopping, and was several
miles beyond the depot before he recognized that there
were several passengers on board for that point. The
conductor took up the plaintiff's ticket before reaching
the next stop, Coffeeville, made to him a statement of
the troubles with the immigrants, and with the person
who had rung the bell cord, as an explanation and ex-
cuse for his own negligence in failing to stop at his place
of destination, and promised to make arrangements for
the speedy return of the plaintiff from Coffeeville with-
out charge. In that case, the lower court authorized
the jury to assess punitive damages. This court, revers-
ing the judgment in the court below, says that, "by
a long train of decisions in this state, which simply an-

nounce the rule everywhere recognized such damages are permissible only where there has been some element of intentional wrong, or, in the absence of intention, a negligence so gross as to evince a reckless disregard of consequences.'' A careful and analytical examination of this opinion will disclose that carelessness in the sense of forgetfulness, something to which mankind generally are prone, excludes the essential idea of reckless conduct. *Scurr's case, supra,* may be said to be a case of momentary forgetfulness, caused or produced by the party's attention having been attracted by other matters relating to his business, and hence negatives any willfulness or recklessness.

There is no conflict between the case of *Y. & M. V. R. R. Co.* v. *Hughes,* 50 South. 627, and *Davis* v. *Railroad Co.,* 95 Miss. 540, 49 South. 179. These opinions were written by the same judge. In Hughes case, the destination point of the plaintiff was Harriston. The flagman came through the car and called the station Harriston, which was in fact Glass. Mrs. Hughes, thinking it was Harriston, arose and prepared to disembark. She testified that she asked the flagman if it was Harriston, and he replied, ''Yes, ma'am,'' and assisted her to alight. It was a mistake, pure and simple. The flagman said that he called the station Glass; that he saw plaintiff standing in the aisle preparing to get off, and volunteered to assist her, without any knowledge as to her destination point. In that case the court held that punitive damages were not proper. In Davis case, the facts were that it was after dark, and the station Etta was called, and the conductor told plaintiff that they had reached Etta, and appellant then got off, but, before getting off, told the conductor that he was not familiar with the ground, and wanted to be certain that they were at his station. The conductor assured him that they were there, although the conductor himself

had never been over the new route. In that case, this court says: "This was manifestly a case in which the jury should have been 'allowed to say whether, under all the circumstances, there was such gross negligence on the part of the railroad company, such conscious indifference to the rights of the plaintiff and the public, as warranted the imposition of punitive damages."

The Davis case is on all fours with the case at bar. The conductor in this case says that he knew (indeed, he was bound to know) that the plaintiff's destination point was Low. She testifies that the conductor came through the cars and announced Low. When he got to where the plaintiff was, he picked up her baggage, and she followed him, and "he set my baggage down on the ground, and got back on the train, and it pulled out." This action on the part of the conductor was not simply an implied invitation to alight, but it was in the most emphatic manner an express invitation—in fact, it was practically a command—to alight. There is no evidence in the record that the conductor simply make a mistake in announcing the station, no evidence of momentary forgetfulness, and that this negligence was caused by anything, except inattention to his duties. But, even if he had made a mistake in announcing the station, and he really believed, when he carried out of the car plaintiff's baggage and assisted her in alighting, that it was her station, yet after he (the conductor) had left the coach and reached the ground the surroundings clearly indicated to him that the train was not at Low, and that it was some other point. The slightest observation would have informed the conductor that he was putting plaintiff off at the wrong place. The least attention—a mere glance at the surroundings—would have disclosed to him that he was putting this lady off at the wrong place. The court should not, under the circumstances, declare, as a matter of law, that the evidence was in-

sufficient to support the proposition that the conductor was guilty of gross negligence. These matters can be, and almost always are, established only by circumstances.

The day has long since passed when the question as to whether it is necessary, in order to recover punitive damages, for the evidence to be direct that the act was done intentionally or wantonly inflicted; but, upon the other hand, the proposition is well settled that, in the absence of intention or of a wanton injury, a negligence so gross as to evince a reckless disregard of consequences is sufficient to justify the imposition of punitive damages.

This court, in the recent case of *Railroad Co.* v. *Dodds,* 97 Miss. 869, 53 South. 409, says: "Punitive damages are only allowable when there exists some element of intentional wrong, or, in the absence of intention, there must be negligence so gross as to show a reckless disregard of consequences." This expression has been used so frequently by this court—in fact, scarcely a report can be found published within the last fifty years but what the rule as to the infliction of punitive damages is not laid down as in the *Dodds case, supra,* and not only by this court, but by almost every court in America—as to have become crystallized into a rule. *Railroad Co.* v. *Brown,* 77 Miss. 342, 28 South. 949. The difficulty lies, not so much in formulating a rule, but in applying the different facts and circumstances as they arise. It frequently occurs that the evidence is such as to justify the court in holding, as a matter of law, that punitive damages should not be inflicted. But whether the conduct is so reckless as to characterize it as gross, so as to justify the imposition of exemplary damages, is like the question of simple negligence or contributory negligence. In such instances, the rule is well settled that such questions

should be submitted to the jury, if there be conflict in the evidence, or if the facts be undisputed, and reasonable men may draw different conclusions therefrom. The rule has been stated in different language in different cases; but the substance is the same.

In *Nesbit* v. *City of Greenville*, 69 Miss. 22, 10 South. 452, 30 Am. St. Rep. 521; *Fulmer* v. *Railroad Co.*, 68 Miss. 355, 8 South. 517; *Alabama & V. Railway Co.* v. *Summers*, 68 Miss. 566, 10 South. 63; *Railroad Co.* v. *Jobe*, 69 Miss. 452, 10 South. 672, and *Railroad Co.* v. *Turner*, 71 Miss. 402, 14 South. 450, the rule is stated to be that, unless the evidence of negligence is so plain and convincing that all reasonable men would draw the same inference from the facts adduced, it is a question of fact for the jury.

In the recent case of *Southern Ry. Co.* v. *Floyd*, 55 South. 288, the rule is thus stated: "Where the facts are conceded, but the inference in regard to negligence is still doubtful, depending upon the general knowledge and experience of men, it is the judgment and experience of the jury, and not the judge, which is to be appealed to." And, again, in *Abernathy* v. *M., J. & K. C. R. R. Co.*, 97 Miss. 859, 53 South. 540, this court says: "It is a close case, an exceedingly close case, on the evidence; and because it is so exceedingly close and doubtful, because reasonable men might differ as to the question of contributory negligence under all the circumstances, for that very reason, the jury should have been left to solve the question."

In *Stevens* v. *Railroad Co.*, 81 Miss. 206, 32 South. 312, this court, quoting from *Bell* v. *Railroad Co.*, 87 Miss. 234, 30 South. 821, says: "So many questions are integrated usually into the solution of the question of negligence—it is so necessary to examine all the circumstances making up the situation in each case—that it must be a rare case of negligence that the court will take

from a jury." While the judiciary always has, and it is to be hoped always will, represent the highest and the best thought of the age in which they live, yet it must be conceded that a jury, composed as it is of twelve men taken from the common walks of life, and who in their dealing and intercourse are daily and constantly brought in close touch to their fellowmen, are much better fitted and qualified to pass upon such questions than the judge whose duties require him to be at his desk, far removed from the busy hum of trade and traffic and the doings of men. The last quarter of a century has witnessed many changes in the law, especially upon those questions dealing with those that pertain to the functions of the judge, and those which pertain to the functions of the jury. In this country, the jury system may be said to be a distinctive product; and more and more the courts are recognizing the wisdom of leaving to the jury the decisions of questions like negligence, contributory negligence, and reckless conduct. We find this illustrated, not only in the modern rulings of courts, but in legislation of recent years, among which may be found our own statute (chapter 135, p. 125, Laws 1910), wherein it is enacted that "all questions of negligence and contributory negligence shall be for the jury to determine."

The purpose of the legislature was that in all actions of negligence, whether gross, simple, or contributory, the question of negligence was to be left to the jury, if there be any evidence tending to prove the issue. It may be said that this was the rule without the statute. So it was; but this rule had not been observed by the courts in all cases, but in numerous instances the judge decided the question according to his own idea of what constituted negligence; and, in order to make the courts more careful in not trenching upon the province of the jury, and in not being so free and liberal with peremptory

instructions, this statute was enacted. Its purpose was to substitute, where reasonable men might differ, the opinion of the jury for that of the judge. It was a recognition of the truthfulness of the words of Holy Writ that "in a multitude of counsel there is safety." The court should, under this statute, charge the jury what is negligence, contributory negligence, or gross negligence, as the case may be, and then leave to the jury the application of the law thus announced, to the proven facts. This is what the statute means. Of course, if there be no evidence at all showing, or tending to show, negligence, the court still has the power to peremptorily charge the jury. The statute applies in this case, as the injuries complained of occurred after the passage of the statute. Its constitutionality was upheld in *N. & S. R. R. Co.* v. *Crawford,* 55 South. 596.

The writer of this opinion thinks that the verdict is excessive, and on that ground should be reduced, or otherwise reversed.